45 C.C.P.A.(Patents).

**Leonard C. NEUFELD, Appellant,**

v.

**Herman L. MARTE, Appellee.**

**Patent Appeal No. 6340.**

United States Court of Customs
and Patent Appeals.

April 11, 1958.

Charles F. Meroni, Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill., and Rudolph L. Lowell, Des Moines, Iowa (Robert B. Harmon, Washington, D. C., of counsel), for appellant.

Edwin T. Bean, Bean, Brooks, Buckley & Bean, Buffalo, N. Y., and Dos T. Hatfield, Washington, D. C., for appellee.

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON (retired), Associate Judges.

RICH, Judge.

Neufeld, the senior party in this patent interference, appeals from a decision of the Board of Patent Interferences awarding priority to the junior party Marte.

Neufeld filed his application, No. 256,-690, on November 16, 1951, took no testimony and is standing on his filing date. Marte filed his application, No. 304,406, on August 14, 1952. The only issue is priority. The board held that Marte had an actual reduction to practice before Neufeld filed and the question before us is whether a preponderance of the evidence supports this decision.

The common subject matter of the parties' applications has to do with a control switch for the electrically operated windshield wiper of an automobile which also has foot operated windshield washing equipment. Marte's application has been assigned to The Trico Products Corp., Buffalo, N. Y., and Neufeld's has been assigned to The Delman Co., Des Moines, Iowa. The disclosure of each application starts from the premise that it is old to provide an automobile with windshield wipers run by an electric motor and with a washer, that is to say means for squirting water onto the windshield, which is actuated by a pump having a plunger which extends through the floor of the car for foot operation.

Each party conceived the idea of attaching an electric switch to the top of the pump plunger so that both the wipers and the washer could be actuated by foot. Neufeld has the more involved switching arrangement. His switch is in a small box mounted on top of the pump plunger and has three positions, stop, slow and full speed. It is moved through these positions by a T-shaped pivoted pedal on top of the switch box which the operator can tilt with his foot and which he can also push down to pump washing fluid onto his windshield. Marte has a simpler concept. His switch is like a simple doorbell or elevator push-button mounted on top of the plunger, is normally open and is closed by stepping on it. The spring which holds it open is lighter than the spring holding the plunger up so with a light touch of the foot it is possible to close the switch to operate the wiper motor without squirting water. With a heavier tread they can both be operated simultaneously. Neufeld has eliminated the usual manual switch but Marte has wired his foot switch in parallel with it as a shunt so that the manual switch can be used in the ordinary way, in which case the foot switch would be inoperative.

The common subject matter in interference is defined by a single count which was a claim in the Neufeld application, suggested to Marte by the examiner, made by him and reading as follows:

"1. For use with a vehicle having a windshield wiping unit including a wiper and an electrical motor for operating said wiper, and a windshield washing unit including a nozzle and a pump assembly including a pump plunger for supplying fluid under pressure to said nozzle in which the fluid is supplied to the nozzle in response to an axial movement of the pump plunger, *a control switch in circuit with said motor, said switch including an actuating member mounted on said plunger and movable relative to said plunger for controlling the operation of said motor, said actuating member being movable as a unit with said plunger* providing for the supply of fluid under pressure to said nozzle." (Emphasis ours.)

The essence of the inventive subject matter is defined in the italicized portion.

In awarding priority of this invention to Marte on the basis of an actual reduction to practice, the board gave the following concise and accurate summary of the evidence:

"Marte claims the invention was reduced to practice by others acting on his behalf in the early months of 1951. Marte at the time was vice-president and general manager for Joe Toepfner, Inc., a dealer in Studebaker cars. Toepfner discontinued business in 1954.

"In addition to Marte those who testified are: his mother-in-law, Mrs. Toepfner; his brother, Elmer Marte, who worked for Toepfner as shop foreman and later as service manager; Roland Toy, a service mechanic for Toepfner; and Ernest Simon, a laboratory technician who bought cars from Toepfner.

"Elmer Marte identified Exhibit 1 as the control switch which he personally made in January 1951, at his brother's direction. Elmer Marte testified the switch was installed on his brother's demonstrator by Toy and that he and Toy drove the car, taking turns trying it, and that it worked fine (Record, p. 73). The witness further testified (p. 75) that the device was next installed on Mrs. Toepfner's car for a trip to Florida in March, 1951, but he did not test it. After the trip to Florida the switch was removed and next installed on another demonstrator, which he tested and found satisfactory.

"There is clear testimony by Toy that he installed the switch, Exh. 1, on party Marte's demonstrator in January, 1951; that he later took it off and installed it on Mrs. Toepfner's car in March, 1951; and that the device was subsequently removed and installed on party Marte's next car in April, 1951. Toy tested the device on each of the three cars and testified it worked satisfactorily.

"Mrs. Toepfner testified that party Marte accompanied her on the trip to Florida and drove the car, that he operated the device a great deal and that it worked beautifully (Qs. 13 and 20).

"Simon visited the Toepfner shop and operated the device as installed on the first car. Asked what happened, the witness answered 'just what was expected of it'" (Q. 31). See also Qs. 45–50.

Exhibit 1 is in court and we have examined it. As we have indicated, it has all the complexity of a doorbell push-button. It is interesting to note that this control switch, to be mounted on the plunger of a windshield washer pump, is quite obviously made by taking the top, bottom or treadle from a standard make of pump (one of which, having the same kind of top, is also in evidence), making a metal cap to fit over it with a sliding fit, like the cover on a pill box, the cap having an internal annular concentric contact rib, mounting a brass contact plate inside the cap between pieces of insulation so that said rib can touch it, positioning a coil spring around the rib to keep the contacts separated and securing the cap over the plunger top with a spring locking ring. A hole was bored in the edge of the plunger button and a piece of insulated wire soldered to the contact plate was run through it, this wire being long enough to be connected to the wiper motor circuit under the dash. This simple switch is well designed, though obviously not for production, is rugged and mere inspection is enough to show it would close an electric circuit of small voltage whenever stepped on. The only other function required of it is that it can be mounted on and move with the plunger rod of a windshield washer pump and since the part used for that purpose came from such a pump there cannot be much doubt about its capacity to be so mounted.

Judging from the board's opinion, the main contentions which appellant is raising here were all raised before the board and were fully answered by it. Considering them after a review of the record, we are of the opinion that all of appellant's points are decidedly lacking in persuasiveness. We shall review them with the brevity they merit. Appellant purports to organize the discussion in his brief around points numbered 1, 2 and 3 but point 2 is so general and nebulous and the discussion so wanders back and forth across all three points that we shall proceed according to our own analysis.

Appellant's first effort is to lead us away from the fact that all we have to consider is when Marte installed a

simple two-pole foot switch in the existing windshield wiping and washing system of an automobile and made it work satisfactorily. It is first impressed upon us that the invention of the count is a "new combination structure" and that nothing was tested but a single element of that combination, namely the switch. We are told the board erred in treating the count as being directed to a switch instead of a combination. This is an utterly unrealistic contention which asks us to put form ahead of substance and to treat as complex something which is very simple. The evidence shows that the switch, which was the only thing that had to be built because the rest of the "invention" was to be found on production line cars, was installed on three different cars and performed satisfactorily in each case. The wording of the count itself shows that everything was old except the mounting of a suitable switch on the pump plunger and connecting it in the wiper motor circuit. It would seem as though appellant is saying that Marte should have put in evidence a complete installation on a car instead of just the part which, when properly attached to the car, brings the invention into existence. We do not think his failure to do so was fatal to his case.

■ Next appellant attacks with fervor the grossly leading character of the questions propounded by Marte's counsel, pointing out that he objected on that ground twenty-two times and finally resigned himself to asking that the objection continue to apply. True, as in most every interference, many questions were leading, but it is also true that the essential facts of satisfactory testing of the invention of the count in the first quarter of the year 1951, long prior to appellant's filing date, were established by testimony which was not elicited by leading questions and which is consistent with other events which were documented. The several witnesses also told consistent stories and counsel for appellant did not succeed in showing any important inconsistencies on cross-examination. If anything, he brought out that when the witnesses were not sure of an exact date or other fact they said so.

■ Much is attempted to be made of a letter which Trico Products Corp., now the assignee of the Marte application, wrote on March 11, 1952. On October 8, 1951, which incidentally was a month before Neufeld's filing date, Marte sent his switch to Trico saying he had had it on his demonstrator for his personal use and that "the customer reaction was so enthusiastic [I] decided to forward on to you to make available for all users." He also implied in concluding the letter that he would like to make a deal on his idea, but would leave it to Trico to be fair. He aptly referred to this as "a little unique approach." As is not unusual in matters of this kind, Trico failed to reply at once and after some prodding sent the March 11 letter showing a certain lack of enthusiasm and finding some things to criticize. It returned the switch to Marte, apologizing for the long delay. The argument is that this lack of interest on the part of Trico casts doubt on all the testimony as to reduction to practice. We fail to see any logic in this contention. Even if at that time Trico was interested (as it turned out to be later) the last thing one would expect would be for Trico to heap praises on the device. The fact it said it might be dangerous (the stated reason for which appears to be partially contrary to fact) in no degree affects our opinion of the testimony showing satisfactory operation several months earlier. Trico's later behavior totally destroys the impression appellant tries to create with this letter. They acquired the very thing first submitted to them.

■ Appellant asks us to apply here requirements of testing made in other cases involving utterly different inventions, saying that a device in the automobile or airplane field, which may be subjected to different temperature and climatic conditions, must be tested under all such conditions. Without intending to detract in the slightest from the standards which have heretofore been applied

by this court in particular cases, we would point out that a certain amount of common sense must be applied in determining the extent of testing required for a reduction to practice and that what was said in the cited case of Burns v. Curtis, 172 F.2d 588, 36 C.C.P.A., Patents, 860, which involved a fuel pump for airplane engines does not necessarily apply to the facts here. When appellant complains that there was no testimony that Marte's device "would operate under conditions of snow, sleet or ice or even whether an anti-freeze fluid was employed," we are definitely unimpressed. This argument is, of course, tied to appellant's theory of what Marte invented. If we may again refer to the count, the washing unit, in which anti-freeze would be used, is not stated to be a part of what Marte invented but something his invention is "For use with." Anyway, we think even a windshield washer which would not operate properly in the snow and sleet could nevertheless be reduced to practice if it operated satisfactorily in the summer. Having in mind that all Marte's invention is intended to accomplish is a switching action simultaneous with the pushing of a pump plunger, we think weather tests are irrelevant. Anti-freeze in the wash water could have no effect whatever on the switch. Arguments as extreme as this do not help appellant's case.

■ Some sort of contention is based on the theory Marte never tested a combination which contained a "piston type pump" which, it is alleged, is what is shown in his application. This is neither here nor there because the invention of the count is what we are concerned with and all it requires of the pump is that it supply fluid to the nozzle and have a plunger on which to mount the switch. Furthermore, Marte's application nowhere refers to a piston type pump. This is appellant's interpretation of the drawing. He tells us that member 9 is a piston but the specification says at one point that it is a "liquid displacing member" and at another that it is a "plunger." Marte tested his switch mounted on a "plunger" and in construing his specification we go by what it says rather than by what appellant tells us it shows.

It is argued that there should be more drawings, sketches, written records, models, photographs and the like in evidence and that experts from Trico should have been called to testify. If such records do not exist, their absence in court cannot be held against Marte. Appellant has not shown that any existing evidence of that kind was not produced. When an automobile distributor asks his brother who is his shop foreman to make the simple device we have before us, the situation is not one in which drawings and records would normally be produced. The first contact with Trico was months after the date of the satisfactory uses which were proved.

■ On the whole record, Marte proved his reductions to practice not only by a preponderance of the evidence but beyond any reasonable doubt. The decision of the board is therefore affirmed.

O'CONNELL, J., was present at the hearing of this appeal, but, because of illness, did not participate in the decision.

JACKSON, J., retired, recalled to participate was present at the hearing of this appeal but did not participate in the decision.